Filed 10/27/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Oscar H., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Sylvia C., Defendant and Appellant. | B318634 Los Angeles County Super. Ct. No. 20CCJP03683A |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay III, Judge. Conditionally reversed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A mother appeals the termination of parental rights over her son, Oscar H., based on deficient initial inquiry about Indian ancestry. The only source of information about ancestry was the mother. The Los Angeles County Department of Children and Family Services could have satisfied its inquiry obligations by asking for contact information and making a few phone calls. Therefore, we conditionally reverse and remand to allow the Department and juvenile court fully to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (the Act) and related California law. Undesignated statutory citations are to the Welfare and Institutions Code.

I

The mother and father were both born in California. In early 2019, they met and started a relationship. They used drugs together. The mother became pregnant with Oscar H. and used methamphetamine during the pregnancy.

In early July 2020, soon after Oscar H. was born, a Department social worker interviewed the parents.

The father told the Department he lived with his parents until he was nine, lived with a paternal aunt until he was 11, and then spent time with his dad and a paternal uncle in Mexico. About three years ago, the father returned to the United States and lived with a paternal aunt and briefly with his mother before living on the streets.

Oscar H. went home from the hospital with his maternal grandmother and has been in her care throughout the case.

On July 7, 2020, the father called the Department twice. He said he was anxious, suicidal, and "got high a while ago." He reported he needed help. At first he did not disclose his location. Later, he shared a location, but responders could not find him.

The Department spoke by phone to the father two days later.  He agreed to meet a psychiatric mobile response team at a motel.  The father "appear[ed] to be under the influence or tired from wandering the streets."  He denied telling the Department he had been suicidal.

The Department discovered the father had three or four referrals when he was a minor.  The Department quoted a March 2006 referral in which a Regional Center worker said the father had mild mental retardation and autism.

The mother was raised by her mother and stepfather.  Her biological father lives in Nevada.  The mother did not have a relationship with him until she turned 23, about five years before the case began.

The mother said her biological parents were born in the United States and her grandparents were born in Mexico.  The maternal grandmother, however, said her family is Guatemalan.

The mother denied Indian ancestry.

The Department's jurisdiction and disposition report says the mother "only knows father's grandmother is Mexican."  The mother "denied being aware of any Native American ancestry as to the father."

The court held a detention hearing on July 15, 2020.  The court found no reason to know the Act applied based on maternal ancestry.  The father did not attend, so the court deferred a finding under the Act as to him.

The father had a short meeting with a Department social worker on August 14, 2020.  The father was homeless, disheveled, and anxious.  The father had been in contact "several times" and said he wanted help to enroll in an inpatient drug

3

treatment program. The father did not follow through with the Department's referrals and requests for him to take drug tests.

Although the father missed some of the Department's calls, he spoke to the Department at least four times between August 31, 2020, and October 26, 2020. Once, the father said he was "already drugged and drunk" and he wanted to go to rehab. He sometimes agreed to take drug tests but did not show up.

A Department call log shows the Department completed a call with the father on February 18, 2021.

On June 17, 2021, the father was arrested for injuring the mother. The Department learned of the arrest that day. The father remained incarcerated as of June 22, 2021.

In August 2021, the Department completed a due diligence search for the father. The Department identified several potential phone numbers, but they were wrong or disconnected. The Department also sent contact letters.

On August 27, 2021, the court found the Department had completed due diligence for the father and ordered the Department to publish notice. The Department published notice of a section 366.26 hearing in the Daily Commerce.

The father never appeared in the juvenile court.

On November 18, 2021, the court found there was no reason to know the Act applied as to the father. The court's finding was based on the mother's statement about paternal ancestry from the jurisdiction and disposition report.

On February 17, 2022, the court terminated parental rights. It designated the maternal grandmother as Oscar H.'s prospective adoptive parent.

4

II

A

The Department erred by not inquiring of the father and of extended family members.  (See § 224.2, subds. (a) [Department and court have an affirmative and continuing duty to inquire] & (b) [initial inquiry duty includes asking extended family members whether child may be an Indian child].)  The Department should have inquired of the father, paternal extended family members, and the maternal grandfather.

As to the paternal inquiry, the error was prejudicial because the Department made no inquiry of the father or of paternal relatives.  The Department had at least two meetings and eight phone calls with the father, but it never asked him about Indian ancestry.  The Department could have gotten names and contact information of paternal relatives by asking a few questions and could have inquired by making a few calls.  It failed to take these simple steps.  Now the Department has lost track of the father, but it must make a good faith effort to inquire of his family.  The mother, maternal grandmother, or records from the father's several referrals as a minor may have relevant information.

The Department contends its inquiry errors involving the paternal side are harmless, but its arguments are incorrect.

The Department emphasizes that it believes the father's family is Mexican, but it does not explain why this matters.  We do not address this undeveloped point.

The Department contends the father's whereabouts were unknown "throughout the case," but it communicated with him many times.  The father did not need a steady address for the Department to ask about Indian ancestry.

5

The Department also argues the father's drug and mental health struggles made it "inappropriate" to inquire. This is incorrect. The inquiry duty is mandatory. The Department offers no logic or law to explain why a parent's drug use or mental health issues would nullify this duty. Nor does the Department explain why it would have been inappropriate to ask the father for his family members' names and contact information. The Department wanted the father to enroll in drug treatment and had concerns about his mental health. Engaging his family would have been appropriate.

The Department complains the father did not "reveal" the names of his family members, but there is no evidence the Department *asked*. A case where the Department asked and the parent withheld information would present different concerns, but this is not that case.

The mother contends the Department had to inquire of the maternal grandfather. Because remand is warranted due to prejudicial error as to the paternal family, on remand we direct the Department to seek contact information about the maternal grandfather as well as the paternal extended family members and to inquire of them.

B

Oscar H.'s placement with the maternal grandmother does not prove harmlessness. The Department has not proposed or briefed this point. (See Gov. Code, § 68081; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [unraised or unsupported issues are waived].)

On the merits, if the Department properly inquired and found reason to know the Act applied, this counterfactual case could have followed a different path with a different outcome.

6

The following account of these potential paths explains why Oscar H.'s placement does not prove harmlessness.

What happens if there is reason to know a child is an Indian child? The Department sends formal notice to relevant tribes, who determine whether the child meets the definition of an Indian child. (§ 224.3, subd. (a); 25 C.F.R. § 23.108(b).)

If a child is an Indian child, one path is tribal jurisdiction. At a tribe's request, the state court must transfer proceedings to tribal court unless there is good cause not to do so or a parent objects. (§ 305.5, subds. (d) & (e); 25 U.S.C. § 1911(b); see Cal. Courts, Tribal Justice Systems <https://www.courts.ca.gov/3064.htm> [as of Oct. 24, 2022], archived at <https://perma.cc/47X8-DGEJ> [39 California tribes have access to a tribal court].) The effect of tribal jurisdiction is unknown. It is possible the tribal court would not have terminated parental rights or ordered adoption.

Another path is tribal intervention in state court. A tribe may intervene at any point in an Indian child custody proceeding. (§ 224.4; see 25 U.S.C. § 1911(c).) A tribe may appear by counsel or by a tribal representative. (Cal. Rules of Court, rule 5.534.) An intervenor becomes a party to the action. (See Code Civ. Proc., § 387, subd. (b); *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1183, fn. 6.) The tribe gets a say. As examples, the Department must integrate tribal input into the child's case plan and seek active tribal involvement to develop the child's permanent placement plan. (Cal. Rules of Court, rules 5.690(c)(2)(C) & 5.708(f)(7).) An intervening tribe may have changed the outcome of this case.

One more path is tribal involvement outside of formal intervention in state court. The court may permit someone

7

affiliated with the tribe or another representative to address the court and submit written reports and recommendations, among other functions.  (Cal. Rules of Court, rule 5.534(e)(2).)  A representative may have changed the case's trajectory.

Given the different potential paths of this case, compliance with the Act's adoption placement preferences under state law does not prove harmlessness.  The first preference under state law is placement with a member of a child's extended family.  (25 U.S.C. § 1915(a).)  The court's compliance with this preference is not necessarily harmless for several reasons.

First, the preferences are under state law.  A tribe could have sought jurisdiction and those preferences would not bind a tribal court.

Second, in state court, compliance with the default preferences may not control because tribes may establish a different order of preference by resolution.  (See 25 U.S.C. § 1915(c).)  Unless certain exceptions apply, the court and Department must follow that preference.  The default preferences may not apply.

Third, in tribal court or in state court, compliance with adoption preferences is not the only consideration.  Termination of parental rights and adoption were not inevitable.  As explained, tribal involvement may have changed the case's trajectory.

Fourth, assuming the same outcome of termination of parental rights and adoption, the lack of tribal involvement could still cause harm.  The potential harm is acute here, where the child was placed with his maternal family and there was no inquiry of *paternal* family.  If the child has paternal ancestry, placement with the maternal grandmother without identifying

8

this ancestry and informing the tribe does not further the Act's goal of promoting the stability and security of Indian tribes. (25 U.S.C. § 1902.) Losing the chance to transmit cultural values is a tribal harm.

In sum, because the Department does not argue the issue and because the effect tribal involvement may have had on this case is unknown, Oscar H.'s adoptive placement does not establish harmlessness.

## DISPOSITION

The order terminating the mother's parental rights of Oscar H. is conditionally reversed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of Welfare and Institutions Code section 224.2. The juvenile court shall order that within 30 days of the remittitur, the Department perform its initial inquiry of Oscar H.'s potential Indian ancestry consistent with this opinion. If, after completing the initial inquiry, there is no reason to believe Oscar H. is an Indian child, the court shall reinstate its order terminating parental rights.

If the inquiry produces any additional information substantiating Indian ancestry, the Department and the Court shall proceed accordingly under the Act and related California law, including complying with the Act's notice provisions. In the event new notice is given and no tribe responds that Oscar H. is an Indian child within the meaning of the Act, or no tribe seeks to intervene, the court shall reinstate the order terminating parental rights.


WILEY, J.


9

**HARUTUNIAN, J.**

I concur with the majority opinion, except for section II.B. Since I believe remand is compelled by the absence of any inquiry of father or his lineage, we need not address in dicta the appropriateness of placement with the maternal grandmother. I would address that issue only when necessary to do so.

HARUTUNIAN, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**STRATTON, P. J., Dissenting.**

I agree DCFS erred in determining without further inquiry that ICWA did not apply. However, I conclude the error was harmless. The court ultimately designated Oscar H.'s maternal grandmother as his prospective adoptive parent. The minor is not in danger of being separated from his biological family, the evil ICWA was enacted to prevent.

In this case Oscar H. was detained and placed with his maternal grandmother within a week of his birth. He remained with his maternal grandmother throughout the proceedings. He is now two years old, having lived with his grandmother his entire life.

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know

1

the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883.)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

Although DCFS did not fulfill its duties under section 224.2, I cannot find a miscarriage of justice. ICWA itself sets out placement priorities. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian

2

child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915(a).)

Here, the juvenile court implemented ICWA's first preference by finding Oscar H. adoptable by his maternal grandmother, a sensible finding given his lifelong placement with her. Appellant does not argue that her son's proposed adoption is contrary to his best interests or lacks good cause. The juvenile court's plan for Oscar H. belies a finding of prejudice as it is the first preferred placement ICWA mandates had the minor been found to be an Indian child and had his tribe intervened. The abuses ICWA was enacted to prevent are not in play here.
I dissent.

STRATTON, P. J.

3